FILED

2009 Dec-01  AM 10:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | | |
|---|---|---|
| **TOMMY DEAN THURSBY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  6:08-CV-2139-VEH** |
| | ) | |
| **MICHAEL J. ASTRUE** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff Tommy Dean Thursby ("Mr. Thursby") brings this action pursuant to 42 U.S.C. §§ 216(i) and 223 of the Social Security Act.  He seeks review of a final adverse decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner" or "Secretary"), who denied his application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").[1]  Mr. Thursby timely pursued and exhausted his administrative remedies available

---

[1]  In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI.  However, separate, parallel statutes and regulations exist for DIB and SSI claims.  Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates.  The same applies to citations of statutes or regulations found in quoted court decisions.

before the Commissioner.  The case is ripe for review pursuant to 42 U.S.C. § 405(g),

§ 205(g) of the Social Security Act.[2]

## FACTUAL AND PROCEDURAL HISTORY

Mr. Thursby was a 48-year-old male at the time of his hearing before the

administrative law judge (hereinafter "ALJ").  (Tr. 29).  He attended special

education classes, but is unsure what grade he completed.  (*Id.*).  Mr. Thursby quit

attending school at the age of 16, and he did not finish with the twelfth grade.  (Tr.

29-30, 183).

Mr. Thursby has always lived with his mom and dad, who he has indicated

"pretty much" take care of him.  (Tr. 183, 29; *see also* Tr. 19 (ALJ's finding that

claimant "has always lived with his mother")).  His past work experiences include

employment as a laborer or pusher at a wood plant (medium, unskilled work), security

guard (sedentary and semi-skilled work as described by claimant), mig welder

(medium, skilled work), tac welder (light, semi-skilled work), and wire puller (light,

semi-skilled work).  (Tr. 47).

Mr. Thursby states he became disabled on December 20, 2005 (Tr. 104), but

his alleged onset date was later amended to reflect May 10, 2006, which is also his

last day worked.  (Tr. 65, 36).  Mr. Thursby suffers from diabetes mellitus; obesity;

---

[2]  42 U.S.C. § 1383(c)(3) renders the judicial review provisions of 42 U.S.C. § 405(g) fully
applicable to claims for SSI.

degenerative joint disease; and gastroesophageal reflux disease. (Tr. 16, 184). In addition to these particular impairments, Mr. Thursby also claims he is mentally retarded as defined by listing 12.05C ("Listing 12.05C"). (Tr. 28 ("We do contend Mr. Thursby meets a listing. It's listing 12.05C based on his IQ and the conditions he's being treated for at the Waltled Clinic.")); *see also* 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.05; (Tr. 184 ("Mr. Thursby's intellectual abilities fall at the upper end of the Mildly Retarded range.")).

Mr. Thursby protectively filed a Title II application for a period of disability and DIB and a Title XVI application for SSI on May 15, 2006. (Tr. 77-84). The DIB claim was denied on August 1, 2006 (Tr. 54-56), and the SSI claim was denied on August 2, 2006. (Tr. 57-61). Mr. Thursby timely filed a request for a hearing on August 16, 2006. (Tr. 62-63). The hearing before the ALJ was held on February 12, 2008. (Tr. 25). The ALJ concluded Mr. Thursby was not disabled as defined by the Social Security Act and denied both of his applications on May 14, 2008. (Tr. 11-20).

Mr. Thursby filed a request for review on June 30, 2008. (Tr. 4). On September 19, 2008, the Appeals Council denied review, which resulted in the ALJ's decision being the final decision of the Commissioner. (Tr. 1). On November 14, 2008, Mr. Thursby filed his complaint with this court asking for review of the ALJ's decision. (Doc. 1). This court has carefully considered the record, and for the

reasons stated below, reverses the Commissioner's denial of benefits and remands the case to the Commissioner with instructions that Mr. Thursby be awarded benefits.

## STANDARD OF REVIEW

The function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales,* 402 U.S. 389, 390 (1971); *McRoberts v. Bowen,* 841 F.2d 1077, 1080 (11th Cir. 1988); *Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1983); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth*, 703 F.2d at 1239. This court will determine that the ALJ's opinion is supported by substantial evidence if it finds "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id*. Substantial evidence is "more than a scintilla, but less than a preponderance." *Id.*

## STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits and establish his entitlement for a period of disability, the claimant must be disabled as defined by the Social Security Act and the

4

Regulations promulgated thereunder.[3]   The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months."   20 C.F.R. § 404.1505(a).   To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."   20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled.   20 C.F.R. § 404.1520(a)(4)(i-v).   The Commissioner must determine in sequence:

(1)   whether the claimant is currently employed;
(2)   whether the claimant has a severe impairment;
(3)   whether the claimant's impairment meets or equals an impairment listed by the Secretary;
(4)   whether the claimant can perform her past work; and
(5)   whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to former applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel,* 189 F.3d 561 (7th Cir.

---

[3]  The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, as current through October 19, 2009.

1999); *accord, McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "Once the claimant has satisfied steps one and two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform her work, the burden shifts to the Secretary to show that the claimant can perform some other job." *Pope*, 998 F.2d at 477; *accord*, *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  The Commissioner must further show that such work exists in the national economy in significant numbers.  *Foote*, 67 F.3d at 1559.

## FINDINGS OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found Mr. Thursby had not engaged in substantial gainful activity since the amended alleged onset of his disability on May 10, 2006.  (Tr. 16, 65).  Thus, the claimant satisfied step one of the five-step test.  20 C.F.R. § 404.1520(b).  Under step two, the ALJ concluded that "[t]he claimant has the following 'severe' impairments:   diabetes mellitus, obesity, degenerative joint disease, and gastroesophageal reflux disease[.]"  (Tr. 46).  Accordingly, the ALJ concluded that Mr. Thursby satisfied the second step of the sequential disability evaluative process.  20 C.F.R. § 404.1520(c).

At step three, the ALJ determined that Mr. Thursby did not have an impairment or a group of impairments that met or medically equaled one of the listed impairments

in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (Tr. 16).   While Mr. Thursby contended that he satisfied step three by meeting the criteria under Listing 12.05C, the ALJ found otherwise.  (Tr. 16-17).

The ALJ did not find any problems with how Mr. Thursby's I.Q. tests were administered.  Instead he determined that "[a]lthough the record documents that the claimant has a full scale IQ score of 69; the claimant does not have deficits in adaptive functioning as required by the mental listings." (Tr. 16-17).  In reaching this conclusion, the ALJ further indicated that Mr. Thursby had "held skilled jobs in the past, had a good work history and handled his own finances."  (Tr. 17).

The ALJ evaluated Mr. Thursby's residual functional capacity at step four, and the claimant was found to have the ability to perform light and sedentary work with additional limitations.  (Tr. 17).  The ALJ listed Mr. Thursby's additional limitations to include:  "perform[ing] simple, but not complex tasks[;]" "maintain[ing] attention and concentration on those tasks for an eight hour day, provided customary breaks are given[;]" and not being able "to work around unprotected heights or dangerous moving equipment [and] around ladders, ropes, or scaffolds.  (Tr. 17).  Against this backdrop and in reliance upon testimony from a vocational expert, the ALJ determined that Mr. Thursby did not suffer from impairments preventing him from performing his past relevant work as a security guard.  (Tr. 19).

7

It was unnecessary for the ALJ to continue to step five of the sequential analysis due to his finding that Mr. Thursby was able to perform past relevant work. (Tr. 19). Accordingly, the ALJ concluded Mr. Thursby was not disabled as defined by the Social Security Act, at any time from May 10, 2006, through May 14, 2008, the date of the ALJ's decision. (Tr. 19-20).

## ANALYSIS[4]

In this appeal, Mr. Thursby contends that the ALJ erred in finding that he does not meet Listing 12.05C (Doc. 10 at 4) and that the ALJ improperly applied the requirements of the listing. If this is true, the claimant would satisfy step three of the five step evaluation process and would be disabled under the Social Security Act. 20 C.F.R. § 404.1520(a)(4)(iii).

## I.     The First Prong of Listing 12.05C

### A.     The I.Q. Requirement of Listing 12.05C

#### 1.     Mr. Thursby's verbal I.Q. and full scale I.Q. scores meet Listing 12.05C.

Listing 12.05C demands that the claimant have "'[a] valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment

---

[4]  This court has recently entered another disability decision on Listing 12.05C from which the analysis and result in this particular case persuasively flow. *See generally Thompson v. Astrue*, No. 3:08-CV-1901-VEH, (Docs. 12-13) (N.D. Ala. Nov. 9, 2009) (determining that record established claimant's satisfaction of Listing 12.05C and directing Commissioner to award benefits upon remand).

imposing an additional and significant work-related limitation of function.'" *Jones v. Astrue*, 494 F. Supp. 2d 1284, 1287 (N.D. Ala. 2007) (citing *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993) (quoting Listing 12.05C)).  The I.Q. requirement of Listing 12.05C is determined by looking at the lowest score derived from the valid I.Q. test.  *See Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986) (indicating that reliance upon lowest I.Q. score is appropriate when evaluating I.Q. requirement under Listing 12.05) (citations omitted); 20 C.F.R. Part 404, Subpt. P, App. 1, §12.00D.

Mr. Thursby's I.Q. testing was administered by Dr. Alan Blotcky ("Dr. Blotcky") and determined by using the Wechsler Adult Intelligence Scale 3rd Edition ("WAIS").  (Tr. 183-86).  The test results showed Mr. Thursby has a verbal I.Q. of 69, performance I.Q. of 75, and full scale I.Q. of 69.  (Tr. 184).  The claimant's lowest score is the verbal and full scale I.Q. of 69, which is within the required range under Listing 12.05C.  (Tr. 47).  *See, e.g., Popp*, 779 F.2d at 1499 ("In addition, [the listing] provides that, where more than one IQ level is derived from the testing, *e.g.*, verbal, performance and full IQ's from WAIS testing, the lowest of these should be used in conjunction with 12.05.").

## 2.    The ALJ does not dispute the validity of Mr. Thursby's I.Q. testing results.

The standards for determining whether an I.Q. test is valid are stated in the introductory section for mental impairments under Paragraph D of Section 12.00,

which covers documentation.   20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00D.

Section 12.00D(6)(a) states:

> The results of standardized intelligence tests may provide data that help
> verify the presence of mental retardation or organic mental disorder, as
> well as the extent of compromise in cognitive functioning. However,
> since the results of intelligence tests are only part of the overall
> assessment, the narrative report that accompanies the test results should
> comment on whether the I.Q. scores are considered valid and consistent
> with developmental history and the degree of functional limitation.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00D(6)(a).

To have a "valid" I.Q., a standardized intelligence test must be used and the

results from the standardized test must be accompanied by a narrative report. 20

C.F.R. Part 404, Subpt. P, App. 1, § 12.00D(6)(e).  A standardized intelligence test

is one that is generally accepted in the medical community as a scientifically valid test

in terms of reliability and accuracy, such as the WAIS.  *See, e.g., Popp*, 779 F.2d at

1499 ("The listing further provides that the WAIS test is a well standardized

comprehensive intelligence test appropriate to such determination."); 20 C.F.R. Part

404, Subpt. P, App. 1, §§ 12.00D(5)(c), (6)(e).

At no point in his decision does the ALJ "expressly determine whether the I.Q.

scores [a]re valid."  *Alday v. Astrue*, No. 5:08cv217-SPM/WCS, 2009 WL 347722,

at *4 (N.D. Fla. Feb. 11, 2009) (footnote omitted); *see id.*, at *4 n.2  (indicating that

a failure to make an express determination as to validity, by itself, "may be error.")

10

(citing *Thomas v. Barnhart*, No. 04-12214, 2004 WL 3366150, at *2 (11th Cir. Dec. 7, 2004) ("It is therefore critical that an ALJ specifically address and resolve the validity of an I.Q. score; if the I.Q. score is valid and meets or equals the criteria of a listed impairment, the ALJ can go no further.")).  At the same time, nowhere does the ALJ dispute the validity of Mr. Thursby's I.Q. testing results as administered by Dr. Blotcky.

Instead, the ALJ recognizes that "the record documents that the claimant has a full scale IQ score of 69[.]"  (Tr. 16, 18 ("The claimant was administered the [WAIS] which revealed a verbal intelligence quotient (IQ) score of 69, a performance IQ score of 75, and a full scale IQ score of 69.")).  Moreover, later in his decision the ALJ acknowledges that Dr. Blotcky "submitted a detailed report, which included psychological testing, a clinical interview, and observations."  (Tr. 19).

Further, nothing in the record suggests that Mr. Thursby manipulated his I.Q. testing results.  In fact, to the contrary, Dr. Blotcky's report expressly states that "Mr. Thursby was motivated during this exam [and] [h]is test scores are valid."  (Tr. 185). *See Griffin v. Astrue*, No. 5:08cv172-RH/W, 2009 WL 1788185, at *7 (N.D. Fla. June 23, 2009) ("Dr. Horvat found that Plaintiff was 'motivated' and 'tried his best.'") (citation omitted).  Relatedly, the ALJ does not express any concern that Mr. Thursby exaggerated or faked his scores.  Accordingly, substantial evidence supports the

ALJ's implicit acceptance of the validity of Mr. Thursby's I.Q. testing results.

### 3.   The ALJ has not shown good cause to reject Mr. Thursby's I.Q. score.

Even though the ALJ implicitly accepted Mr. Thursby's I.Q. results as valid, this circuit "'has recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record of the claimant's daily activities and behavior.'" *See Alday*, 2009 WL 347722, at *3 (quoting *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992)) (citing *Popp*, 779 F.2d at 1499).   Additional evidence, such as "medical reports, daily activities, behaviors, and other evidence in the record" may be properly inquired into when the ALJ is evaluating the record for such inconsistencies. *Alday*, 2009 WL 347722, at *3  (citing *Popp*, 779 F.2d at 1499).   While the ALJ is not required to accept the results of an I.Q. test as reported by an expert, the ALJ "cannot act as both judge and physician." *See Durham v. Apfel*, 34 F. Supp. 2d 1373, 1380 (N.D. Ga. 1998) (citing *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992)).   Put differently, substantial evidence must support the ALJ's discounting of an I.Q. score that is favorable to a claimant.

Here, the ALJ found that, despite his valid verbal and full scale I.Q. score of 69 and Dr. Blotcky's related determination that he had been mildly retarded <u>since early childhood</u>, Mr. Thursby "does not have deficits in adaptive functioning as

required by the mental listings." (Tr. 16-17). More specifically, the ALJ "found that [the I.Q. scores were] not determinative in light of Plaintiff's ability to perform skilled jobs, his good work history, and the fact that he had handled his own finances." (Doc. 11 at 10; Tr. 17).

Later in his decision, the ALJ assigned little weight to Dr. Blotcky's findings explaining:

> However, the undersigned finds that the examination was not consistent with the evidence of record and has therefore not given Dr. Blotcky's findings significant weight. The undersigned notes that the claimant never alleged any mental problems and he has a good work history. The claimant has held a skilled job with an SVP of 6, as well as other semi-skilled jobs. He has no deficits in adaptive functioning. He also testified that he handled his own finances when he worked, although he has always lived with his mother. Therefore, Dr. Blotcky's opinion is given little weight.

(Tr. 19).

Thus, the issue facing this court is whether substantial evidence supports the ALJ's discounting of Mr. Thursby's valid I.Q. scores as inconsistent with other evidence contained in the record. Courts have upheld decisions discrediting I.Q. scores as incredible. *See, e.g., Popp v. Heckler*, 779 F.2d 1497, 1499-1500 (11th Cir. 1986) (finding performance I.Q. score of 69 to be inconsistent with claimant who "was close to completing the requirements for a bachelor of science degree and had a history of having taught high school algebra"); *see also Strunk v. Heckler*, 732 F.2d

1357, 1360 (7th Cir.1984) ("The plaintiff has failed to supply this court, nor have we

found any case law requiring the Secretary to make a finding of mental retardation

based solely upon the results of a standardized intelligence test in its determination

of mental retardation").

As the Eleventh Circuit explained in *Popp*:

> The issue to be resolved by this court is whether the ALJ may find
> the results of an IQ test to be incredible so that Listing 12.05 is not
> satisfied, and, if such an analysis is permissible, whether the ALJ was
> justified in disregarding the test results in this case.

> Listing 12.00B4 does not require the Secretary to make a finding
> of mental retardation based on the results of an IQ test alone. The listing
> requires the Secretary to take into account the intelligence test *and* the
> medical report. Moreover, the test results must be examined to assure
> consistency with daily activities and behavior. Thus, in the instant case,
> it was proper for the ALJ to examine the other evidence in the record in
> determining whether Popp was in fact mentally retarded.

> There is substantial evidence in the record to support the ALJ's
> finding that Popp is not mentally retarded. First, the ALJ pointed out
> that Popp was close to completing the requirements for a bachelor of
> science degree and had a history of having taught high school algebra.
> Moreover, Popp was not alleged to be failing in his college course
> studies. The ALJ properly found this to be inconsistent with a finding
> of mental retardation.

> . . .

> In summary, the ALJ was not required to find that Popp was
> mentally retarded based on the results of the IQ test. The ALJ is required
> to examine the results in conjunction with other medical evidence and
> the claimant's daily activities and behavior. There is substantial
> evidence in the record to support the ALJ's finding that the results of the

IQ test were incredible because they were inconsistent with other evidence and because there was good reason to believe that Popp exaggerated his problems.

*Popp*, 779 F.2d at 1499-1500 (emphasis by underlining added) (internal citation omitted).

A comparison of the facts in *Popp* shows that the present case is significantly distinguished from the former.  As Judge Guin of this district observed regarding *Popp*:

> The Commissioner's analysis, at least regarding his work history, seems to be inconsistent with *Lowery*, which emphatically states that "an ALJ may not consider a claimant's age, education, and work experience after the ALJ accepts the I.Q. score as valid."  979 F.2d at 837.  The court notes, however, that the *Lowery* court also states that it "has been recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." 979 F.2d at 837 (citing *Popp v. Heckler*, 779 F.2d 1497 (11th Cir.1986)).  A review of *Popp*, however, makes clear that the consideration goes to whether the I.Q. score is valid.  In *Popp*, the court found the ALJ could properly find the plaintiff's I.Q. score to be "incredible because they were inconsistent with other evidence and because there was good reason to believe that Popp exaggerated his problems." *Popp* 779 F.2d at 1500.  Therefore, it seems clear that the ALJ in Popp refused to credit the I.Q. scores.  This is not surprising in view of the facts of that case.  The plaintiff in *Popp* "held a two-year college associates degree and was enrolled in a third year of college as a history major." *Id.* at 1498.  He had worked as an administrative clerk in the Army and after discharge had been employed as a statistical clerk. *Id.*  His other jobs included "postal clerk, soil testing technician, cashier, and algebra teacher at a private school for grades ten through twelve." *Id.*

*Cobb v. Barnhart*, 296 F. Supp. 2d 1295, 1298 (N.D. Ala. 2003) (emphasis added).

Here, unlike the plaintiff in *Popp* and as fully acknowledged by the Commissioner, Mr. Thursby "attended school until age 16 in <u>special education</u>, but did not know his grade level." (Doc. 11 at 2 (emphasis added)).   Further, "[e]ducational records show that he was very slow and [that he was] placed in an [educable mentally retarded or an] EMR class." (Doc. 11 at 2 (citing Tr. 145)). Therefore, Mr. Thursby's educational background is dramatically different from the record achieved by the plaintiff in *Popp*.

Also in sharp contrast to *Popp*, Mr. Thursby has a work history mix of mostly semi-skilled jobs with one unskilled and one skilled position, but has never held any clerk or teaching positions. (Tr. 47, 125).  Moreover, while the ALJ characterizes Mr. Thursby's prior employment as a good work history, his employment record still lacks the degree of technical knowledge and sophistication that the plaintiff in *Popp* enjoyed. *See Popp*, 979 F.2d at 837 (finding I.Q. inconsistency on basis of plaintiff's "various technical jobs such as an administrative clerk, statistical clerk, and an algebra teacher"); *see also Alday*, 2009 WL 347722, at *7 ("'There is no evidence that these jobs are beyond the reach of a mildly retarded individual.'") (citing *Durham*, 34 F. Supp. 2d at 1380).  Additionally, Mr. Thursby's previous employment has not been continuous; there have been several  job changes as well as gaps in

service.  (Tr. 105,125).

Other distinguishing factors include that, in *Popp,* "[t]he results of the personality testing (MMPI) could not be considered valid by the administering psychologist because the 'values of scores obtained suggests that Mr. Popp attempted to appear in a very unfavorable light.'"  779 F.2d 1498-99 (citation omitted). Therefore, evidence of the plaintiff's tendency to exaggerate existed in *Popp*, while no similar proof exists here.  *See Alday*, 2009 WL 347722, at *7 ("There is no evidence here that Plaintiff was malingering or failing to make an effort on the I.Q. test, and the psychologist found the test scores to be valid.").

Furthermore, the psychologist concluded, despite the results of his I.Q. testing, that Mr. Popp "was functioning 'within the Borderline range of measured intelligence.'"  779 F.2d at 1499 (citation omitted).  Unlike *Popp*, "[t]here are no equivocal diagnoses here.  The psychologist did not find [Mr. Thursby] to be in the higher range of borderline intellectual functioning." *Alday*, 2009 WL 347722, at *7 (comparing that case's circumstances to *Poff*).

Regarding Mr. Thursby's work history as a basis for discrediting his I.Q. score, this case is closer to *Alday* than to *Poff*:

> The jobs Plaintiff has done from time to time are more like the jobs that the claimants in *Durham* and *Brown* had done.  Plaintiff's work history is not substantial evidence in the record to determine that her I.Q. score was invalid or that, by her work history, she has exceeded the prognosis

of those scores through adaptive behavior. <u>Therefore, the evidence of</u>
<u>Plaintiff's work history is not substantial evidence in the record to</u>
<u>discount her I.Q. scores</u>. The ALJ should have found that Plaintiff's I.Q.
scores were valid and met one criterion of Listing 12.05C.

2009 WL 347722, at *7 (emphasis added). Likewise, this court concludes that Mr.

Thursby's prior employment does not provide good cause for discounting his I.Q.

results.

In addition to relying upon his work history, the ALJ attempts to discredit Mr.

Thursby's I.Q. scoring on the basis that he handles his own finances. In fact, the

evidence adduced at the hearing regarding Mr. Thursby's finances was:

> Q. Did you manage your own finances? When you got paid a check
> were you able to handle your own money?
>
> A. Yes, Sir.
>
> Q. <u>Did you have - - did you have a checking account or anything like</u>
> <u>that</u>?
>
> A. <u>No, Sir, never had any checking account</u>.
>
> Q. Okay. Did you have bills you had to pay?
>
> A. Yes, Sir.
>
> Q. <u>What kind of bills did you have to pay</u>?
>
> A. <u>I had paid off a '93 Ford Ranger that I had borrowed the money</u>
> <u>for and I had paid that off</u>.
>
> Q. Okay. How did you make the payments on that?

18

A.     By working at (INAUDIBLE), working at - - you know, for a (INAUDIBLE) company and for - -

Q.     No.  I mean, how did you physically have to pay it.  Did you take a payment down to him every month, or did you pay it - - if you didn't pay him by check, how did you pay off your note?

A.     I have been putting so much money out of each and every paycheck to put back.

Q.     Okay.

A.     To go make the payment on that.  <u>I never did mail it in to him.  I - - because I never knew how to - - I guess get something paying for it, you know, so I went and paid it myself</u>.

Q.     Okay.  In person?

A.     Yes, Sir.

(Tr. 42-43 (emphasis added)).

Therefore, Mr. Thursby does not maintain his own checking account, and noticeably absent from this testimony is any indication that he paid for customary monthly household bills like power, phone service, and water.  As such, considering the entire context of his testimony, Mr. Thursby's limited exposure to managing his finances in the form of hand-delivering his car payments and cashing his paychecks does not provide good cause for discounting his I.Q. score.  *See also Alday*, 2009 WL 347722, at *7 (citing *Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003) (determining that "'<u>ability to pay his own bills, add and subtract, use an ATM</u>

19

machine and to take care of all his own personal needs,' and 'ability to identify and

administer his medication; his previous jobs; his obtaining a GED' were not

inconsistent with a finding of mental retardation and the I.Q. scores") (emphasis

added) (other citation omitted)).

The ALJ also challenges the I.Q. results on the basis that Mr. Thursby has

apparently never reported that he suffers from a mental deficiency.  The defendant

raised a comparable argument in *Alday*, which the court, by its holding, implicitly

found to be unpersuasive:  "Defendant points out that Plaintiff did not testify to

limitations due to lack of intelligence, and her medical records did not mention this

limitation."  2009 WL 347722, at *4.  To the extent that such an omission in self-

reporting is, indeed, inconsistent with Mr. Thursby's I.Q., it falls well short of the

substantial evidence threshold that is necessary to disregard the result entirely.

In this instance, the court concludes that the ALJ has failed to give a good

reason why Mr. Thursby's valid I.Q. results should be disbelieved.  Even considering

the claimant's work history and adaptive behaviors, the evidence still fails to provide

an adequate basis to support discounting Mr. Thursby's I.Q. scores. *E.g., Alday*, 2009

WL 347722, at *5 ("The daily activities cited by Defendant [such as "having a

boyfriend, sweeping, doing laundry, taking care of a dog, and walking grandchildren

to school"] do not constitute substantial evidence in the record to disregard the

finding by Dr. Ghostley that Plaintiff is mildly mentally retarded."); *id.* ("That Defendant lives with a boyfriend, R. 278, is not substantial evidence to discount the I.Q. scores."); *Stephens v. Astrue*, No. 1:07cv1001-CSC, 2009 WL 387157, at *6 (M.D. Ala. Feb. 13, 2008) ("Thus, the record indicates that Stephens' daily activities and behavior are consistent with those of an individual suffering from mental retardation with a valid full-scale IQ score of 61."); *Durham*, 34 F. Supp. 2d at 1380 (N.D. Ga. 1998) (rejecting ALJ's conclusion that claimant's work as a heavy laborer over the past forty years showed a "long history of adaptive behavior" because "[t]here [wa]s no evidence that these jobs [we]re beyond the reach of a mildly retarded individual").

In sum, substantial evidence does not support the ALJ's attempt to discredit Mr. Thursby's valid I.Q. results due to his work history and other adaptive functioning. *See Griffin*, 2009 WL 1788185, at *10 ("The ALJ's assumption, that Plaintiff's work history reflects an ability to do his past relevant work in a competitive environment is not supported by substantial evidence in the record and is not an adequate basis to discount his I.Q. scores."); *id.* ("That he is able to wash dishes, mow the lawn, and take care of his personal hygiene, has been held to be not substantial evidence to discount his I.Q. scores.").   Therefore, Mr. Thursby has satisfied the I.Q. requirement of Listing 12.05C.

**B.     The Diagnostic Requirement of Listing 12.05C.**

In addition to the I.Q. requirement of Listing 12.05C, a claimant must also satisfy the diagnostic description in the introductory paragraph of Listing 12.05. 20 C.F.R. Part 404, Subpt. P, App. 1, §12.00A (stating that under Listing 12.05, "[i]f your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.").  The introductory section to Listing 12.05 defines mental retardation as follows:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Therefore, a claimant must have manifested 'significantly subaverage general intellectual functioning with deficits in adaptive functioning' prior to the age of 22 in order to meet Listing 12.05C." *Jones,* 494 F. Supp. 2d. at 1287.  In the Eleventh Circuit,  a person's I.Q. is presumed to remain constant throughout life, so "[a] valid I.Q. test meeting the Listing criteria creates a rebuttable presumption that the condition manifested itself before age twenty-two." *Jones*, 494 F. Supp. 2d at 1287-

22

88 (citing *Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001)).[5]  "The requirement that mental retardation or low IQ began prior to age 22 is met when nothing in the record reflects an incident in which claimant suddenly became mentally retarded."  *Durnham v. Apfel*, 34 F. Supp. 2d 1373, 1381 (N.D. Ga. 1998) (citing *Gant v. Sullivan*, 773 F. Supp. 376, 382 (S.D. Fla. 1991); *Lowery*, *supra*).

Against this backdrop, because no evidence of a sudden occurrence resulting in Mr. Thursby's mental deficits exists in the record, he benefits from the rebuttable presumption relating to the diagnostic requirement of Listing 12.05C.  Relatedly, nothing in the ALJ's decision attempts to explain why he is not entitled to benefit of this rebuttable presumption relating to the diagnostic definition of Listing 12.05C.[6]  Moreover, to the extent that the ALJ relies upon Mr. Thursby's adaptive functioning in an effort to show he does not meet the diagnostic criteria, that fails to satisfy the substantial evidence standard for the same reasons that it provided an insufficient basis for discounting his I.Q. score.

For additional guidance, this court turns to *Lowery*.  In *Lowery*, the Eleventh

---

[5]  In *Hodges*, the court formally recognized the presumption that "[w]hen a claimant presents a valid I.Q. score meeting the [§ 12.05] Listing criteria, the claimant is presumptively disabled under the Listing if the other requirements of the Listing have been met." *Jones v. Astrue*, 494 F. Supp. 2d at 1288 (citing *Hodges*, 276 F.3d at 1269).  Before *Hodges*, the presumption had not been formally recognized, but this circuit had implicitly embraced it in *Lowery*, 979 F.2d at 837.  *See Hodges*, 276 F.3d at 1269.

[6]  Indeed, the court does not even see where the ALJ even mentions the rebuttable presumption in his decision.

Circuit first noted regarding Listing 12.05C:

> Generally, a claimant meets the criteria for presumptive disability under section 12.05(C) when the claimant presents a valid I.Q. score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than "minimal effect" on the claimant's ability to perform basic work activities. *See Edwards by Edwards v. Heckler*, 755 F.2d 1513, 1517 (11th Cir. 1985). This court, however, has recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior. *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986) (rejecting a claim of section 12.05(C) mental retardation where the claimant's I.Q. score of 69 was inconsistent with evidence that he had a two-year college associate's degree, was enrolled in a third year of college as a history major, and had worked in various technical jobs such as an administrative clerk, statistical clerk, and an algebra teacher). Although the ALJ is allowed some leeway to evaluate other evidence when determining the validity of an I.Q. score, an ALJ may not consider a claimant's age, education, and work experience after the ALJ accepts the I.Q. score as valid and finds that the claimant meets or equals the criteria of a listed impairment. *See Ambers v. Heckler*, 736 F.2d 1467, 1470 (11th Cir.1984) ("consideration of the fact that [claimant] could return to her past work is not a relevant inquiry once she has met the Listing of Impairments in Appendix 1"); 20 C.F.R. § 404.1520(d).

979 F.2d at 837 (emphasis added). Therefore under *Lowery*, an ALJ's "leeway to evaluate other evidence when determining the validity of an I.Q. score" is limited, and once the ALJ has been determined it to be valid, no consideration of "a claimant's age, education, and work experience" is appropriate.

The court then pointed to the ambiguity in the record as to the actual basis for finding the plaintiff unable to satisfy Listing 12.05C:

24

> The basis for the findings below is ambiguous. The ALJ found
> that Lowery does not have an impairment or combination of
> impairments that meet or equal the requirements of section 12.05(C).
> Apparently, the ALJ based this finding on a rejection of the validity of
> Lowery's I.Q. score after a *Popp v. Heckler*-style analysis of the
> inconsistency between Lowery's I.Q. score and evidence of his daily
> activities, behavior, work history, and old educational placement tests.
> The ALJ specifically recognized that Lowery would be disabled under
> section 12.05(C) if Lowery's I.Q. score were accepted as the sole
> indicator of the claimant's residual intellectual capacity and considered
> in combination with his physical impairments. The Appeals Council,
> however, stated that the ALJ did not find Lowery's I.Q. scores invalid
> based on a *Popp v. Heckler* analysis. Instead, the Appeals Council
> concluded that the ALJ based its finding that Lowery did not meet the
> requirements of section 12.05(C) based on evidence that Lowery's
> mental retardation did not manifest itself before age twenty-two. The
> recommendation of the magistrate judge, adopted as the opinion of the
> district court, further complicates the basis for the ALJ's finding. The
> magistrate judge concludes that the ALJ did choose to discount
> Lowery's I.Q. scores based on a *Popp v. Heckler*-style analysis of
> inconsistency with Lowery's daily activities, behavior, work history, and
> other relevant evidence.

979 F.2d at 837-38 (emphasis added). A similar lack of clarity exists in the ALJ's

decision here: "[T]he claimant does not have deficits in adaptive functioning as

required by the mental listings." (Tr. 16-17 (emphasis added)). Also, the ALJ never

directly addressed the validity of Mr. Thursby's I.Q. results; instead he implicitly

accepted them. *See* § I.A.2, *supra*.

The *Lowery* court then explained:

> Despite the ambiguity, the Secretary's brief concedes that Lowery
> has a current valid I.Q. score of 69 and an additional and significant
> work-related limitation of function. Thus, this court need only decide

> whether substantial evidence in the record supports the ALJ's finding
> that Lowery's mental retardation did not manifest itself before age
> twenty-two. We readily conclude that substantial evidence does not
> support the ALJ's finding that Lowery's mental retardation did not
> manifest itself before age twenty-two.

979 F.2d at 838 (emphasis added). Therefore, in addressing the diagnostic definition under Listing 12.05C, the *Lowery* court never turned to a consideration of the plaintiff's vocational abilities and adaptive functioning; instead the entire focus was whether the record substantiated the plaintiff's mental retardation as a lifelong condition.

Akin to the plaintiff in *Lowery*, the validity of Mr. Thursby's compliant I.Q. score has been accepted by the Commissioner and his additional non-mental impairments have already been determined to be severe by the ALJ. (Tr. 16); *see also* § II.A, *infra*. Therefore, under *Lowery*'s framework, the only relevant inquiry is whether substantial evidence shows "[Mr. Thursby]'s retardation is not a lifelong condition which manifested itself before [Mr. Thursby] reached age twenty-two." 979 F.2d at 836. Furthermore, like *Lowery*, "substantial evidence does not support [any] finding that [Mr. Thursby]'s mental retardation did not manifest itself before age twenty-two." Accordingly, Mr. Thursby has met all the requirements relating to the first prong of Listing 12.05C.[7]

---

[7] With the exception of *Popp*, which is significantly distinguishable as analyzed above, none of the contrary cases cited by the Commissioner is binding on this court; nor does the undersigned find any of them to be persuasive given the circumstances of this case. In particular, the court notes that

## II.     The Second Prong of Listing 12.05C

**A.     The ALJ's error in not reaching the second prong of Listing 12.05C by improperly discounting Mr. Thursby's I.Q. score and/or incorrectly determining his inability to satisfy the diagnostic description under the first prong does not require remand for further consideration because the ALJ sufficiently developed the record to show that the second prong of Listing 12.05C is satisfied.**

The ALJ did not explicitly reach the second part of Listing 12.05C, which analyzes whether the claimant has "a physical or other mental impairment imposing additional and significant work-related limitation of function."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.  In light of this court's finding that the first prong of Listing 12.05C of a valid I.Q. score of 60 through 70 has been satisfied, it was  error for the ALJ to not continue to the second prong of whether the combination of Mr.

---

while an unpublished panel upheld a finding of no disability under Listing 12.05C in *Humphries v. Barnhart*, 183 Fed. Appx. 887 (11th Cir. 2006), despite the claimant's I.Q. score of 65, the court did so without any reference to, much less a discussion, of *Lowery*.  Relatedly, it does not appear that the rebuttable presumption of a lifelong mental deficiency played any role in the *Humphries* decision as there is no mention of it.  Also, while *Humphries* maintains, citing to *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997), that the Eleventh Circuit has "held that to be considered for disability benefits under Listing 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning, (2) have deficits in adaptive functioning, and (3) have manifested those deficits before age 22," in fact this statement made in *Crayton* about Listing 12.05 is unsupported by any cited authority and regardless is dicta as the  "holding" was strictly limited to the area of administrative exhaustion.  *Crayton*, 120 F.3d at 1222 ("We hold only that in this case both the practical considerations and the guiding principles of exhaustion dictate that these claimants should make their claims to the agency and exhaust their administrative remedies before the federal court would have jurisdiction to review the agency decision.") (emphasis added).  Furthermore, the record in *Humphries* showed that the plaintiff there had "worked in a school cafeteria for 21 years, and served as the manager for about 15 years." *Id.* at 889.  Such a history of employment approaches the caliber of the plaintiff in *Poff* and, in any event, no similar evidence of job stability and supervisory authority exists in this record.

Thursby's other impairments imposed "significant" limitations on his functional abilities.

"[A] 'work-related limitation of function' must be 'significant,' but it need not be a 'severe impairment' as defined at Step 2[.]" *Griffin*, 2009 WL 1788185, at *10 (quoting *Edwards by Edwards v. Heckler*, 755 F.2d 1513, 1515 (11th Cir. 1985)). Relatedly, an impairment satisfying the second prong of Listing 12.05C is not required, in itself, to be disabling. *Edwards*, 755 F.2d at 1515 (citation omitted). "An impairment imposes significant limitations when its effect on a claimant's ability to perform 'basic work activities' is more than slight or minimal. *Id.*

Now the court must look to see whether the ALJ determined within the record if the claimant's other impairments (*i.e.*, beyond his mental retardation) impose additional and significant work-related limitations. *See Edwards*, 755 F.2d at 1515 ("The question remains whether his asthma or chronic obstructive lung disease imposes an 'additional and significant work-related limitation of function.'"); *cf. Cobb v. Barnhart*, 296 F. Supp. 2d at 1298 ("The Commissioner found the plaintiff has 'chronic low back pain, mild mental retardation, depression and bilateral cataracts, . . . impairments which cause significant vocationally relevant limitations.'") (citation omitted).

Here, the ALJ expressly found that "[t]he claimant has the following 'severe'

impairments:   diabetes mellitus, obesity, degenerative joint disease, and gastroesophageal reflux disease[.]" (Tr. 46).  This finding of severity substantiates that the ALJ determined that Mr. Thursby's other impairments have more than a "minimal effect" on his ability to perform basic work activities.   *See, e.g., Edwards*, 755 F.2d at 1516 ( "Because Edwards's asthma and lung disease affect his ability to exert himself, they have more than a "minimal effect" on his ability to perfect basic work activities."); *Alday*, 2009 WL 347722, at *8 ("At Step 2, the ALJ found that Plaintiff has severe impairments, diabetes mellitus and degenerative disc disease. R. 22."); *Alday*, at *8 ("Accordingly, the ALJ found that Plaintiff has 'a physical or other mental impairment imposing an additional and significant work-related limitation of function,' and that criterion of Listing 12.05C was met.") (citation omitted).  Therefore, the record shows that Mr. Thursby also meets the second prong under Listing 12.05C.

## CONCLUSION

The ALJ correctly found  the claimant satisfied steps one and two of the five-step sequential evaluation process.  Under step three, the ALJ's decision that Mr. Thursby does not meet Listing 12.05C is not supported by substantial evidence.  In particular, under step three, the ALJ failed to give good cause for discounting of the claimant's I.Q. or otherwise excluding him from coverage under Listing 12.05C.

Instead, the sequential five step analysis should have ended at step three with finding Mr. Thursby disabled under Listing 12.05C, rather than continuing to step four.

A remand for further evidentiary proceedings is unnecessary in this instance because the record has been adequately developed and there is ample evidence of a disability. *See Alday*, 2009 WL 347722, at *8 (indicating that "[r]eversal is warranted where the record is fully developed and, upon the application of the correct legal standards, the claimant is entitled to benefits") (citations omitted). Remand is with an order to enter benefits because, although the ALJ did not expressly apply the second prong, the findings made by the ALJ and adopted by the Commissioner have already addressed and resolved that Mr. Thursby has additional significant impairments beyond his reduced mental capacity that satisfy the second prong of Listing 12.05C.

Therefore, this court reverses the ALJ's finding that Mr. Thursby was not disabled within the meaning of the Social Security Act under Listing 12.05C and remands with direction to award benefits because the record shows that Mr. Thursby has met all the applicable requirements. A separate order will be entered.

**DONE** and **ORDERED** this the 1st day of December, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge